2004 OK CIV APP 94

**CHESAPEAKE EXPLORATION LIMITED PARTNERSHIP, Plaintiff/Appellee,**

v.

**CHESAPEAKE EXPLORATION LIMITED PARTNERSHIP and Chesapeake Operating, Inc., Defendants/Appellees,**

**and**

**Exok, Inc., Defendant/Appellant.**

**No. 99,142.**

Court of Civil Appeals of Oklahoma, Division No. 3.

April 16, 2004.

Rehearing Denied May 21, 2004.

Certiorari Denied Nov. 29, 2004.

Michelle P. Cullen, and Michael G. Harris, Moricoli, Harris & Cottingham, Oklahoma City, OK, for Appellees.

Clifford A. Wright, Clifford A. Wright, P.C., Oklahoma City, OK, for Appellant.

Opinion by CAROL M. HANSEN, Judge.

¶ 1 Defendant/Appellant, EXOK, Inc., seeks review of the trial court's judgment in favor of Plaintiff/Appellee, Chesapeake Exploration Limited Partnership, as successor in interest to the claim of the original plaintiff, Ward Petroleum Corporation (Ward), and in favor of Defendants/Appellees, Chesapeake Exploration Limited Partnership and Chesapeake Operating, Inc. (collectively Chesapeake). We reverse because the trial court failed to properly apply the indemnity provision of the wellbore assignment agreement and remand with instructions to enter judgment for EXOK on its claim for indemnity against Chesapeake and to determine the amount of EXOK's damages.

¶ 2 According to the parties' stipulations, in 1992 the mineral lessees in Section 8, Township 13 North, Range 17W, Custer County, entered into a joint operating agreement (JOA) for the development of oil and gas in the entire section from the surface to the base of the Morrow formation, also known as the Baxter formation. The JOA designated Chesapeake as the operator. The initial well in the contract area, the Hester 1–

8 well, was drilled to the base of the Morrow and completed in the Morrow.

¶ 3 The well produced from only the Morrow formation from June 1992 to September 1992. In October 1992, the Morrow was isolated to allow for completion in the shallower Atoka formation. The well produced only from the Atoka from October 1992 through March 1993. In April 1993, the well was dually completed to produce from both the Morrow and Atoka formations. The ownership interests in the formations were different and the gas produced from each formation was separately metered and reported to the Oklahoma Tax Commission. The well produced from both formations through April 1994. In May 1994, the Morrow was again isolated, and from May 1994 through May 1996, the well produced from only the Atoka.

¶ 4 The well was shut in from June 1996 through December 1996. In January 1997, the Atoka formation in the Hester 1–8 well was permanently abandoned. Since that time, the well has produced from only the Morrow.

¶ 5 At the time the Atoka was abandoned, Chesapeake had received and sold 77,883 Mcfs [1] of gas more than the amount proportionately allocable to its working interest in the well; in other words, Chesapeake was overproduced. Of this amount, 37,859 Mcfs were allocable to Ward, and 37,854 Mcfs were allocable to another working interest owner, Teikoku Oil (USA) Co., Ltd. (Teikoku), whose interest Ward later acquired. According to Ward's correspondence, on September 11, 1995, Ward demanded gas balancing in kind from Chesapeake for both itself and Teikoku, for whom it was marketing gas at that time. In later correspondence, Ward stated it had received no response to its demand.

¶ 6 According to the parties' exhibits, Chesapeake placed its interest in the Hester 1–8 wellbore for sale in an auction conducted on August 11, 1999, by the Oil & Gas Asset Clearinghouse (Clearinghouse) in Houston, Texas. Chesapeake's representative signed

1. Mcf = one thousand cubic feet.

an agreement with Clearinghouse in which, among other things, it agreed as follows:

> ... to use reasonable efforts to accurately and completely describe the Properties and all working, net revenue, overriding royalty and other interests of Seller therein on Exhibit "A" attached hereto, all property data sheets and on the conveyancing instruments delivered to Buyer at the Sale;

> . . .

> [N]otification by Buyer to Seller, within sixty (60) days of the recordation filing date of the conveyancing documents, that any overproduced gas imbalance attributable to the acquired property as of the effective date of the conveyance is in excess of 120% of that reflected on the property data sheet(s), shall, at the option of Buyer, be cause to void the purchase and sale of the affected property.

¶ 7 Chesapeake submitted a property data sheet for the Hester 1–8 stating it had a production imbalance of 9,689 Mcfs as of April 1, 1999. The following statement was printed at the bottom of the property data sheet: "DUE DILIGENCE AND VERIFICATION BY BUYER IS REQUIRED—The information contained above is provided without warranty or guarantee by Seller or The Oil & Gas Asset Clearinghouse as to accuracy, completeness or otherwise."

¶ 8 EXOK registered as a buyer at the auction. In doing so, its president signed a preprinted form stating EXOK represented and acknowledged the following, in part:

> c. I/we have performed complete due diligence on all of the properties that the undersigned wishes to purchase; including without limitation the review of property data files, contacting Seller, contacting the operator, verifying production histories and rates through independent reporting sources and performing all tasks necessary to evaluate a property to the undersigned's complete satisfaction. . . .

> d. In the event Seller or The Clearinghouse discovers any breach of the representations and acknowledgments contained herein, Seller may at its election, rescind the sale of any properties sold to the undersigned and the undersigned shall promptly reassign and return all interests previously conveyed to it, free and clear of any liabilities or other burdens incurred since the assignment to the undersigned by Seller. In the event of any such rescission by Seller of the properties, the purchase price or any other funds of the undersigned held by Seller or its employees or agents shall be returned less any amounts Seller may reasonably be due in respect to any of the undersigned indemnification obligations set forth herein;

> e. No representations or warranties of any kind or nature, expressed or implied, have been made to the undersigned by Seller and/or The Clearinghouse, or any officer, director, employee, representative, contractor or subcontractor of same; . . .

¶ 9 EXOK's president also signed a preprinted form entitled "Buyer's Terms and Conditions of Purchase," stating in part,

> 4. . . . BUYER ALSO UNDERSTANDS AND ACKNOWLEDGES THAT SOME TERMS CONTAINED IN SELLER'S CONVEYANCE DOCUMENTS MAY BE INCONSISTENT WITH THE TERMS AND CONDITIONS SET OUT HEREIN AND THAT IN THE EVENT OF ANY CONFLICT THE TERMS CONTAINED IN THE CONVEYANCE DOCUMENTS SHALL PREVAIL.

> . . .

> 6. PRODUCTION IMBALANCES: Buyer understands that certain of the properties being offered may be subject to oil and/or gas balancing obligations due to the overproduction or underproduction of hydrocarbons. Buyer has investigated (by operator contact or other appropriate means) and is aware of which properties being offered for sale are overproduced or underproduced and shall take any such

**624**

production imbalances into account when bidding on any such property. Buyer shall be fully responsible for collecting on or discharging any balancing obligations affecting any property that Buyer may purchase and shall indemnify Seller and The Clearinghouse from and against any and all liabilities in connection with or arising out of any such balancing obligations.

¶ 10 Chesapeake's assisting controller for its acquisitions and divestitures group testified he compiled the list of properties Chesapeake offered for sale at the August 11, 1999 auction. He said he and other staff members assembled the data and information Chesapeake gave to Clearinghouse to provide to bidders. He testified that when he asked the gas balancing group to furnish him gas balancing statements, he gave them a property list with a numeric list number. The list included the property number for the Morrow interests in the Hester 1–8 well. The controller testified, "And the Atoka, that I was not aware of, had a different property number. And the reason it had a different property number, it had a different ownership, which I wasn't aware of. So, basically, on the lists that we asked for, we got the gas balancing statements for the list of properties that I had requested." He testified he did not intend to mislead anyone by only including the Morrow imbalance.

¶ 11 EXOK's president testified he and his consulting engineer evaluated the wells for potential purchase. He said they reviewed the files provided by Chesapeake as well as public data, and formulated bids on certain properties. He testified the Atoka reservoir imbalance as it existed on August 11, 1999 was not disclosed, and had he known of the Atoka imbalance, he would have reduced his bid of $95,000.00 by $1.00 per Mcf of imbalance, or by $77,500.00. EXOK's president testified he verified the accuracy of the information on the Chesapeake documents by visiting the Chesapeake booth at the sale and asking for updated information on the property and specifically any gas balancing changes. On cross-examination, he said the Chesapeake person did not disclose the Atoka imbalance. He admitted the land files for

the Hester well contained an Atoka gas balancing statement that was attached to a piece of correspondence dated five years earlier, and had he looked at that piece of paper, he would have known the Atoka imbalance was kept separately from the Morrow imbalance. He admitted that had he called Ward or another working interest owner, he might have learned of the Atoka imbalance.

¶ 12 Prior to the auction, Chesapeake submitted a revised property data sheet to reflect that the amount of its interest offered for sale was its percentage interest in the Morrow formation, and it added the statement "ONLY PRODUCING IN THE BACKSTER (sic) ZONE (DIFFERENT INTEREST IN ATOKA)." The sheet stated it was revised as of August 3, 1999.

¶ 13 EXOK bought the property at the auction. The conveyancing document, entitled Wellbore Assignment, Bill of Sale and Conveyance, stated it conveyed Chesapeake's interest in the wellbore only of the Hester 1–8 well. The document said the conveyance was made subject to several enumerated contracts, including "operating agreements." It did not list the auction contracts among those contracts to which it was subject. The assignment also stated as follows:

It is expressly understood and agreed that (i) Assignor shall be responsible for, and shall indemnify and hold Assignee harmless from, all claims, costs, expenses and liabilities which arise or accrue prior to the Effective Time with respect to the Interests; (ii) Assignee shall be responsible for, and shall indemnify and hold Assignor harmless from, all claims, costs, expenses and liabilities which arise or accrue after the Effective Time with respect to the portion of the Interests assigned hereunder; ...

The assignment stated its Effective Time was September 1, 1999, at 7:00 a.m. Central Standard Time (CST).

¶ 14 EXOK's president testified he learned of the Atoka imbalance when a Ward representative called him within a few days after the sale. On August 26, 1999, Ward sent a letter to Chesapeake stating,

The last balancing statement we received for the Atoka reflected Ward un-

derproduced 35,000 + mcf. By letter of September 11, 1995, we requested gas balancing on this zone. No response was received from Chesapeake. If the Atoka is no longer productive, Ward would like an immediate cash balancing based on an average of price received during the underproduction.

On September 2, 1999, Ward sent a letter to both Chesapeake and EXOK stating it would look to both parties for cash balancing because it had not received additional gas as provided in the gas balancing agreement of the JOA. Both Chesapeake and EXOK denied liability for the Atoka imbalance.

¶ 15 Ward acquired Teikoku's interest and filed the instant suit against Chesapeake and EXOK alleging it was underproduced by 71,269 Mcfs in the Atoka common source of supply and seeking cash balancing. Chesapeake and EXOK answered, denied liability to Ward, and filed cross-claims against each other for indemnity. After Chesapeake reached a settlement agreement with Ward under which Ward assigned to Chesapeake its underproduced balances in the Hester well, Chesapeake was substituted as plaintiff. It filed an amended petition seeking balancing in kind. EXOK then filed a counterclaim and cross-claim for actual and constructive fraud and negligent misrepresentation.

¶ 16 The matter went to trial before the court on January 23 and 24, 2003. The parties submitted extensive stipulations of fact and stipulated to the admission and withdrawal of exhibits. Chesapeake called two witnesses and EXOK called one witness. After the close of evidence, the trial court granted judgment in favor of Chesapeake and against EXOK on all claims. It ruled Chesapeake, as successor in interest to Ward, was entitled to balancing in kind of 25% of EXOK's share of gas from the Hester well until it recovered its gas imbalance of 75,718 Mcfs of underproduction. The trial court awarded Chesapeake $86,522.44 on its claim for indemnity against EXOK. EXOK appeals from this judgment.

¶ 17 EXOK contends the trial court erred by not finding the wellbore assignment agreement controlled and allocated the liability for the Atoka imbalance to Chesapeake. The interpretation of a contract is a matter of law, unless it requires extrinsic evidence. We will review matters of law under a *de novo* standard. *First Nat'l Bank and Trust Co. of Stillwater v. McKown*, 1993 OK CIV APP 156, 867 P.2d 1342, 1345.

¶ 18 Our paramount objective in construing a contract is to give effect to the mutual intention of the parties as it existed at the time of contracting, as far as it is ascertainable and lawful. 15 O.S.2001 § 152. The language of a contract governs its interpretation if the language is clear and explicit and does not involve an absurdity. 15 O.S.2001 § 154. The intention of the parties to a written contract must be ascertained from the writing alone, if possible. 15 O.S.2001 § 155. If there are several contracts relating to the same matter, between the same parties, and made as parts of substantially one transaction, we will interpret the contracts together. 15 O.S.2001 § 158.

¶ 19 The contracts before us include the conveyance agreement between Chesapeake and EXOK, the buyer's agreement between Clearinghouse and EXOK, and the seller's agreement between Clearinghouse and Chesapeake. The buyer's and seller's agreements are not between EXOK and Chesapeake; however, in the buyer's agreement, EXOK granted enforceable rights to Chesapeake, and in the seller's agreement, Chesapeake granted enforceable rights to EXOK. The buyer's and seller's agreements relate to the same matter as the conveyance agreement and were made as parts of substantially one transaction. Therefore, we will interpret all three contracts together.

¶ 20 The buyer's agreement provided that in the event of any conflict between its terms and those of the conveyance agreement, the terms contained in the conveyance agreement would prevail. The seller's agreement incorporated this provision by reference. Therefore, both Chesapeake and EXOK agreed the terms of the conveyance agreement prevailed over the terms of the buyer's and seller's agreement.

¶ 21 The conveyance agreement unambiguously provided Chesapeake was responsible for, and would indemnify and hold EXOK harmless from, all claims, costs, expenses, and liabilities which arose or accrued with respect to the Hester 1–8 wellbore prior to

September 1, 1999, at 7:00 a.m. CST. Ward's claim for gas balancing arose before that time. Pursuant to the gas balancing agreement incorporated in the JOA, Ward was entitled to make up its underproduced balance by taking 25% of Chesapeake's share of production upon giving notice to Chesapeake. It gave such notice to Chesapeake on September 11, 1995. Chesapeake's failure to allow balancing in kind pursuant to the JOA gave rise to a claim by Ward for money damages, or cash balancing. In addition, the JOA provided for cash balancing "[s]hould production of gas be discontinued before the gas account is balanced." On August 26, 1999, Ward demanded cash balancing if the Atoka was no longer productive. According to the parties' stipulations, Atoka was no longer productive. Ward's claim for gas balancing was a claim, cost, expense, or liability which arose or accrued with respect to the Hester 1–8 wellbore prior to September 1, 1999, at 7:00 a.m. CST.

¶22 Pursuant to the conveyance agreement, Chesapeake was responsible for and would indemnify and hold EXOK harmless from Ward's claim. To the extent the buyer's and seller's agreements provide otherwise, they must be disregarded. The trial court's judgment in favor of Chesapeake is REVERSED and this matter is REMANDED with instructions to enter judgment for EXOK on its claim for indemnity against Chesapeake and to determine the amount of EXOK's damages.

¶23 Because we reverse based upon the trial court's failure to properly apply the indemnity provision of the wellbore assignment agreement, we need not consider EXOK's other contentions of error, except to note the award of attorney fees and costs to Chesapeake necessarily fails because the judgment upon which it is based is reversed.

¶24 REVERSED and REMANDED with direction to enter judgment for EXOK and set damages in favor of EXOK.

JOPLIN, J., and MITCHELL, P.J., concur.